No. 89-519

IN THE SUPREME COURT OF THE STATE OF MONTANA

1990

_____

IN THE MATTER OF THE PETITION FOR CHANGE
OF NAME OF:
JAMES JOSEPH IVERSON, a Minor Child,

KARON LYNN HEPP,
          Petitioner and Appellant,
   and

RONALD EDWARD IVERSON,
          Respondent and Respondent.

'90 JAN 24 PM 1 23 FILED
ED SMITH, CLERK
MONTANA SUPREME COURT

_____

APPEAL FROM:  District Court of the Eighth Judicial District,
              In and for the County of Cascade,
              The Honorable Joel Roth, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        James D. Elshoff, Great Falls, Montana

    For Respondent:

        E. Lee LeVeque; Conklin, Nybo, LeVeque & Murphy, Great
        Falls, Montana

_____

Submitted on Briefs:  Dec. 7, 1989

Decided: January 24, 1990

Filed:

_____
         / Clerk

Mr. Justice R. C. McDonough delivered the Opinion of the Court.

Karon Lynn Hepp filed a petition for name change of James Joseph Iverson, a minor child, on May 5, 1989. A hearing on the matter was held and on August 7, 1989, the District Court for the Eighth Judicial District, Cascade County, dismissed the petition. We affirm.

The sole issue on appeal is:

Whether the District Court abused its discretion when it denied Karon Hepp's petition for change of name.

On May 26, 1988, Karon Hepp (Karon) gave birth to James Joseph Iverson (J.I.). The natural father of J.I. is Ronald Iverson (Ronald). Although Karon and Ronald were not married at the time of J.I.'s birth, both acknowledge that Ronald is the biological father and this fact is recorded on J.I.'s birth certificate.

According to Karon, following the birth of J.I., Ronald promised to marry her. As a result of this promise, Karon gave J.I. Ronald's surname. J.I.'s first and middle names were taken from his two grandfathers. Eventually the engagement fell through and because Karon felt that Ronald had not paid adequate attention to J.I., she filed a petition to change J.I.'s name to Joseph Scott Hepp.

In compliance with Montana law, Ronald was served and interested parties were notified through publication with a local newspaper. A trial was held on August 7, 1989, and the District

1

Court found that changing J.I.'s name was not in his best interest. Accordingly, the petition was dismissed. This appeal followed.

A change of name proceeding is statutory and is governed by § 27-31-101, MCA, et seq. Unfortunately, these statutes do not set forth with any specificity the acceptable reasons for allowing the change of name of a person. However, in two recent decisions, we have held, that in contested cases when one parent seeks to change his or her child's name, the court shall determine whether the best interest of the child will be served. If the petitioner in such cases fails to make such a showing, it is proper for the district court to dismiss the petition. In re Marriage of Firman (1980), 187 Mont. 465, 610 P.2d 178; In re Marriage of Overton (1983), 207 Mont. 292, 674 P.2d 1089.

Review of a district court's ruling in these matters is very narrow. A lower court's decision regarding the best interest of the child will not be overturned on appeal unless there is a clear abuse of discretion. Allen v. Allen (1978), 175 Mont. 527, 575 P.2d 74. In Overton, we said:

> "We will not substitute our judgment for that of the trier of fact, but rather will only consider whether substantial credible evidence supports the findings and conclusions. These findings will not be overturned by this Court unless there is a clear preponderance of the evidence against them. We will view the evidence in a light most favorable to the prevailing party, recognizing that substantial evidence may be weak or conflicting with other evidence, yet still support the findings." (Citations omitted.) 674 P.2d at 1090.

In light of these policies, we must review the decision of the

2

District Court in a light most favorable to Ronald. If there is not a clear showing of abuse of discretion, the judgment of the District Court must stand.

The lower court held that Karon's reasons for changing J.I.'s name were not persuasive and were not in the best interests of the child. It based this conclusion upon substantial, albeit conflicting evidence.

Karon maintains that she gave J.I. Ronald's surname because of his promise to marry her. She argues that this promise was breached, and that therefore she should be allowed to change the child's surname to her own. She further argues that Ronald has not kept in contact with J.I. According to her petition, Ronald has not visited with J.I. since October of 1988. Accordingly, he has not contributed to the daily care and upbringing of the child.

The evidence presented by Ronald, however, tends to rebut Karon's contentions. Ronald acted pro se throughout the lower court proceeding. He did not therefore file any memoranda or petitions. However, he did testify upon his own behalf at the lower court hearing. His testimony revealed that he had in fact attempted to maintain contact with J.I. since his break up with Karon. He testified that he had attempted to call Karon on numerous occasions in order to visit with his child, that each time he called, she hung up on him. He also stated that he has spoken with E. Lee LeVeque, a local attorney, in an attempt to gain visitation rights. Further, it is uncontested that he has con-

tinually paid child support. At this point he is paying $100.00 a month to the Department of Revenue, who passes the money on to Karon. Before J.I. was born, Ronald paid $1,007.60 directly to Karon for pregnancy and other child rearing expenditures.

The District Court took all of this evidence into consideration and determined that the proposed name change would not be in J.I.'s best interest We note that most of this evidence is uncontradicted. Perhaps the only point of disagreement between Ronald and Karon is the extent of his visitation with J.I. Karon maintains that he has not maintained contact with the child; however, as we stated earlier, Ronald argues that he has attempted to remain in contact, but his efforts have been thwarted. The District Court viewed the testimony of both parties and the parties themselves. Based upon its perceptions of this testimony, it held that J.I.'s name should not be changed. There is substantial evidence to support this conclusion and it is not arbitrary or capricious.

Karon desired to change J.I.'s name in a manner which would not only dispense with the child's paternal surname, but also with his paternal grandfather's first name. The lower court found such a result is not warranted in light of the facts that Ronald has acknowledged paternity, is paying child support and is seeking a court order granting him visitation rights. The lower court did not clearly abuse its discretion and we must therefore affirm.

_____
Justice

4

We Concur:

_____
Chief Justice

_____

_____

_____
Justices

Justice Diane G. Barz, dissenting.

I dissent. The majority has determined that the District Court did not abuse its discretion when it determined that the best interest of the child was to retain his father's surname. I agree that the proper test to be applied in this case is what is in the best interest of the child, however, I maintain that the District Court abused its discretion when applying this test.

In this case, the District Court cited the father's acknowledgement of paternity, his payment of $100 per month in child support, and his purported plans to seek a court order granting him visitation rights with the child as the basis for dismissing the petition and determining that it was not in the child's best interest to change his name. These three factors, however, do not even touch upon the child's best interest. Instead, these factors merely reinforce traditional notions regarding the "proper" surname for a child. When viewed from a different perspective, these three factors could also be used to justify changing the child's surname to that of the mother's, as the mother has acknowledged maternity, she more than likely pays over $100 per month in supporting the child, and she has assumed the day to day responsibility and care for the child.

This Court has only had the opportunity to address this issue in two other instances. See, In re Marriage of Overton (1983), 207 Mont. 292, 674 P.2d 1089; In re Marriage of Firman (1980), 187 Mont. 465, 610 P.2d 178. These type of cases, however, are likely to arise with more frequency as people, and women in particular,

6

question this society's customs and traditions regarding surnames. This Court should therefore set forth clear guidelines that a district court could use when confronted with a petition to change a child's surname. These guidelines should naturally be based on the child's best interest and not the best interest of the mother or the father of the child.

Other jurisdictions have touched upon this subject and have set forth factors that a court should consider in determining a child's best interest when confronted with a petition to change the child's name. Included among these factors are the child's preference, if any, the length of time the child has had the surname, the impact of the requested name change on both the mother-child and the father-child relationships, and any misconduct by either parent that would make that parent's surname "possibly deleterious." See, Hamman v. County Court, Jefferson County (Colo. 1988), 753 P.2d 743, 749. Other factors cited include the child's age, the child's embarrassment or discomfort when bearing a surname other than the family the child is presently living with, and the effect a surname may have on easing relations with a new family. In re Marriage of Schiffman (Cal. 1980), 620 P.2d 579, 583. In addition, I would also include consideration of whether the child has any siblings, the child's relationship to those siblings, and the impact on the child of having surnames different from the siblings' surnames. These factors address more directly a child's best interest when confronted with a name change than the father's magnanimous acknowledgement of paternity, his ability to follow a

7

court order of paying $100 per month to help support the child, and his plans to seek visitation rights with the child.

This Court's past decisions on these type of cases also clearly demonstrate that guidelines are needed for the district courts, otherwise, the traditional preference for the father's name will continue and a subtle form of discrimination against women will prevail. In particular, in Overton the mother and father were divorced when the mother was five months pregnant. Upon the child's birth, the mother gave the child her surname. This Court noted that she had two other children with her surname and desired to have all her children bear the same name so as to prevent confusion and embarrassment. Two years after the child's birth, the father petitioned to have the child's surname changed to his and to clarify his visitation rights. The facts state that the father sought the child's birth certificate from the county clerk and recorder's office so as to enroll her in the Indian tribal rolls, but the facts do not indicate that changing the child's surname was necessary for enrollment. Overton, 207 Mont. at 293-94, 674 P.2d at 1090. The decision also does not state the factors that the district court relied upon when determining that the best interest of the child was to have her surname changed to that of the father's. Instead, this Court merely held that the findings and conclusions regarding the name change was not clearly erroneous and that sufficient evidence supported the findings. Overton, 207 Mont. at 296, 674 P.2d at 1091. While this Court in Overton stated that the equality of sexes was not an issue, the absence of

8

guidelines for the district courts in these type of situations allows for a subtle form of discrimination to occur by granting a preference for the father's name.

In <u>Firman</u>, this Court expressed a prevailing attitude when it held that the district court "should not permit an <u>unnatural barrier</u> to come between [the father] and [his] children." <u>Firman</u>, 187 Mont. at 470, 610 P.2d at 181 (emphasis added). The use of the words "unnatural barrier" are in themselves language that suggests a preference for the father's name. A New Jersey court in <u>In re</u> Rossell (N.J.Super. 1984), 481 A.2d 602, artfully stated that

> [t]he emergence of women as equals of men in our society may be our most significant revolution. The acceptance of that emergence is grudgingly slow; it is an acceptance which the courts must not impede. Names, as this case clearly illustrates, are intimately involved with the status of women. Rules of law for changing names cannot be premised upon unacceptable theories of inequality. The right of a mother to have the child bear her name must be recognized as equal to that of the father.

481 A.2d at 605. While the courts are not outwardly and perhaps not even knowingly contributing to this subtle form of discrimination against women, the fact remains that the absence of guidelines in these type of cases only act to impede women's status in society. In <u>Romeo and Juliet</u>, Shakespeare wrote,

> What's in a name? That which we call a rose
> By any other name would smell as sweet.
> (II, ii, 43.)

However, Romeo's and Juliet's fateful outcome attest to the problems that arise as a result of a system based on customs and

9

traditions attached to surnames. I would therefore reverse and remand this case to the District Court to assess whether the child's name should be changed in light of the factors suggested in this dissent.

_____
Justice